Ollie W. Kelley and Olive L. Kelley v. Commissioner.
Kelley v. Commissioner
Docket No. 2443-63.
United States Tax Court
T.C. Memo 1964-267; 1964 Tax Ct. Memo LEXIS 73; 23 T.C.M. (CCH) 1622; T.C.M. (RIA) 64267; October 8, 1964
*73 W. H. Neblett, 649 S. Olive St., Los Angeles, Calif, and B. H. Neblett, for the petitioners. Edward M. Fox, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies and additions to tax against petitioners as follows: Additions to Tax
Sec. 294(d)
Sec. 293(b)
Sec. 6653(b)
(1)(A)
Year
Deficiency
I.R.C. 1939
I.R.C. 1954
I.R.C. 1939
1952
$2,764.04
$1,382.02
$246.13
1953
1,370.90
685.45
126.86
1954
3,372.92
2,124.01
508.37
1955
4,044.08
$2,022.04
1956
3,595.30
1,797.65
1957
7,502.72
3,751.36
1958
2,034.01
1,017.00
By amended answer respondent claims increased deficiencies and additions to tax as follows: Additions to Tax
Sec. 294(d)
Sec. 293(b)
Sec. 6653(b)
(1)(A)
Year
Deficiency
I.R.C. 1939
I.R.C. 1954
I.R.C. 1939
1952
$ 174.00
$ 87.00
$15.65
1953
820.92
410.46
73.88
1954
1955
1,121.37
$560.69
1956
158.74
79.37
1957
32.63
16.32
1958
84.08
42.05
The issues for decision are: (1) Whether respondent properly determined deficiencies *74 for the years 1952 through 1958 by using the net worth plus expenditures method for establishing petitioners' correct taxable income; (2) whether any part of the deficiencies was due to fraud with the intent to evade the tax or the payment thereof; (3) whether petitioners' income tax returns for each of the years 1952 through 1958 were false and fraudulent with intent to evade tax so that the tax may be assessed at any time; and (4) whether petitioners' failure to file a declaration of estimated tax for the years 1952, 1953 and 1954 was due to reasonable cause and not to willful neglect. Findings of Fact Many of the facts were stipulated and are hereby found accordingly. Ollie W. Kelley (hereinafter called petitioner) and Olive L. Kelley are husband and wife, residing at 1818 Victoria Avenue, Los Angeles, California. During the years 1952 through 1958 they filed joint tax returns with the district director of internal revenue at Los Angeles, California. Petitioner is a businessman managing various properties in the Los Angeles area. From 1950 through 1958, he was a partner in the firm of McNeil-Kelley, which owned and operated two hotels and a restaurant. On January 11, 1951, the *75 partnership sold one of the two hotels and distributed the proceeds to both partners. Petitioner's share, $14,685, was deposited by him in a commercial account at the Security First National Bank of Los Angeles. By December 31, 1951, the balance had been reduced to $105.35. The partnership tax return for 1951 shows that petitioner withdrew an additional $315 from the partnership during the year. On January 1, 1952, the petitioner's assets and liabilities were as follows: ASSETS
Cash: on Hand
$ 2,000.00
in Banks
187.73
Automobiles
6,300.96
Household Furnishings
653.95
Business Holdings
17,782.98
Real Estate: Dwelling, 146 W. 52d St., Los
Angeles
5,500.00
Dwelling, 325 E. Colden Ave.,
Los Angeles
12,814.16
$45,239.78
LIABILITIES
Payables: Bank Loans
$ 2,138.51
Mortgages & Notes
11,146.07
13,284.58
NET WORTH
$31,955.20
Petitioner made numerous personal purchases during the seven years in issue, the cost and payment of which are fully stipulated. Some of the major items are as follows: 1. Household appliances costing $758.15 in 1952. 2. New residence purchased in 1954 at a cost basis of $23,608.20. 3. Ten items *76 of household furnishings in 1955 totaling $508.56. 4. Two diamond rings purchased in 1956 for $9,921.05. 5. A trap-gun and gun cabinet purchased and paid for in 1956 at a cost of $1,009.30. Two additional rifles were bought in 1957 at a cost of $1,554. These two items were paid for by the end of 1958. Throughout this period the petitioner continued to trade his personal automobiles for newer models. Sales prices, trade-in allowances financing and payments are stipulated. Petitioner's investment had grown from $6,300.96 on January 1, 1952, to $16,240 on December 31, 1958, while his indebtedness on these assets increased from $2,138.51 to $2,587. Petitioner acquired receivables during the years involved by selling assets and by making cash loans to third parties. These transactions were as follows: Amount
Notes and Mortgages
Due
Total Amount
Receivable
Date Acq'd
Cost
12/31/58
Received
Meyers, Otha & Bessie Mae
1- 3-52
$ 3,000.00
$ 2,120.20
$ 879.80
Nakatani, Noriyuki &
10-18-54
12,000.00
1,479.59
10,520.41
Chiyeko
Sulcer, Mildred & Jesse
10-22-54
3,837.51
2,634.34
1,203.17
Winfrey, Celeste
12-13-54
2,500.00
2,500.00
Williams, Ruth Johnson
12-18-58
8,269.40
10,500.00
Totals
$29,606.91
$16,734.13
$15,103.38
*77 Ruth J. Williams was heavily indebted and applied to petitioner for a loan. Upon the collateral she offered, he agreed to give her $10,500, evidenced by her note and mortgage for that amount. Petitioner agreed to pay the largest bill, an attorney fee, directly and give her the balance in cash. The legal fee was compromised for $4,500 without Ruth Williams' knowledge. Thereafter, petitioner gave her the difference between the original amount due her attorney ($6,730.60) and the face of the note, producing a cost basis of $8,269.40 reflected in the above schedule. The McNeil-Kelley partnership was dissolved in 1954 after the sale of its remaining asset, the La Jolla Hotel. Petitioner then devoted his business skills to the management of his rental properties. The cost or adjusted basis of these assets and depreciation charged are set out below: Summary of Rental Properties & Personal Business
Total Cost or Adjusted
Basis
Annual
Improve-
Years
Land
ments
Involved
325 E. Colden Avenue
1955-1958
$ 2,440.89
$ 7,460.82
2031 Third Avenue
1954-1958
4,297.10
39,112.41
9224 & 9230 S. Figueroa Street
Oct.
9,526.70
64,838.50
1957-1958
Sweet Dreams Cafe -
Leasehold
1958
1,500.00
Furn. & Fixtures
1958
1,500.00
$16,264.69
$114,411.73
*78 Summary of Rental Properties & Personal Business
Depre.
Total
Est.
Straight
Reserve
Life
Line
12/31/58
325 E. Colden Avenue
25
$ 298.43
$ 1,193.72
2031 Third Avenue
33 1/3
1,173.37
5,866.85
9224 & 9230 S. Figueroa Street
33 1/3
1,945.16
2,301.34
Sweet Dreams Cafe -
Leasehold
3
500.00
500.00
Furn. & Fixtures
10
150.00
150.00
$4,066.96
$10,011.91
Petitioner incurred various personal and business liabilities throughout the years 1952 through 1958. The following is a statement of his indebtedness at the close of each taxable year involved: Outstanding Liabilities as of December 31
Mortgages
Personal
Year
& Notes
Loans
Bank Loans
Total Payables
1951
$11,146.07
$2,138.51
$13,284.58
1952
7,838.14
7,838.14
1953
40,212.78
4,214.00
44,426.78
1954
31,707.30
$13,300.00
1,680.00
46,687.30
1955
22,227.96
10,800.00
33,027.96
1956
20,873.81
6,500.00
27,373.81
1957
66,722.84
900.00
67,622.84
1958
61,539.80
900.00
62,439.80
Petitioner's deductible and nondeductible expenses have all been stipulated. Losses on personal automobile trade-ins and confiscations *79 have been stipulated as to amounts. Petitioner understated his taxable income for the years 1952 through 1958 as follows: Computation of Understatements of Taxable Income *
1952
1953
1954
1955
Net Worth, as of Dec. 31
$44,670.90
$44,626.38
$77,584.16
$91,687.68
Less prior year's net worth
31,955.20
44,670.90
44,626.38
77,584.16
Increase in Net Worth
$12,715.70
$ (44.52)
$32,957.78
$14,103.52
[1] Plus: Non-deductible exp. 3,771.29
8,047.17
2,460.15
8,140.46
[2] Non-deductible losses 5,450.96
436.52
Total
$16,486.99
$13,453.61
$35,417.93
$22,680.50
[3] Less: Deductible Expenses (1,000.00)
(1,217.76)
(1,000.00)
(1,517.41)
Non-taxable portion of long
term
gain
(2,912.45)
(10,849.55)
Personal Exemptions
(3,000.00)
(3,000.00)
(3,000.00)
(3,000.00)
Reported Income
(248.76)
(9,704.09)
Understatement of Taxable
$ 9,574.54
$ 8,987.09
$10,864.29
$18,163.09
Income
Computation of Understatements of Taxable Income *
1956
1957
1958
Net Worth, as of Dec. 31
$104,565.95
$123,907.47
$128,841.36
Less prior year's net worth
91,687.68
104,565.95
123,907.47
Increase in Net Worth
$ 12,878.27
$ 19,341.52
$ 4,933.89
[1] Plus: Non-deductible exp. 3,863.16
7,461.76
3,679.43
[2] Non-deductible losses 1,705.36
2,579.70
2,087.00
Total
$ 18,446.79
$ 29,382.98
$ 10,700.32
[3] Less: Deductible Expenses Non-taxable portion of long
term
gain
Personal Exemptions
(3,000.00)
(3,000.00)
(3,600.00)
Reported Income
(4.12)
(156.67)
Understatement of Taxable
$ 15,442.67
$ 26,226.31
$ 7,100.32
Income
*80 In October 1956, agents of the Franchise Tax Board of the State of California began investigating petitioner's income tax liabilities to the State for the years 1935 through 1955. The State agents determined petitioner's income tax liability by using the net worth plus expenditures method. As a result of such investigation, deficiencies in petitioner's state income taxes and fraud penalties were proposed against him. These deficiencies and penalties were later paid by petitioner. Respondent's agents, using the reports and records of the investigation of petitioner's income tax liabilities by the Franchise Tax Board of the State of California, made an independent investigation of petitioner's *81 Federal income tax returns for the years 1952 through 1958. In doing so, they verified leads as to assets, liabilities and expenditures furnished them by the State Franchise Tax Board. They investigated third party sources to secure financial information concerning the petitioner. They searched public records, made inquiries of other Governmental agencies, and checked commercial institutions such as brokerage houses, stores, credit bureaus and escrow companies for leads. Petitioner refused, on advice of counsel, to answer any questions or give any information regarding his income tax liabilities. He also refused to produce any books or records, which he destroyed while his tax returns were under investigation by the State agents. Petitioner conducted many of his financial transactions on a cash basis, although he regularly employed bookkeepers and accountants who informed him on several occasions that his books and records were inadequate. Ultimate Findings 1. Part of the deficiency for each of the years 1952 through 1958 was due to fraud with intent to evade tax. 2. Petitioners' income tax returns for the years 1952 through 1958 were false and fraudulent with intent to evade *82 tax and assessment and collection of the deficiencies and additions to tax for each of those years are not barred by the statute of limitations. 3. On their joint Federal income tax returns for the years 1956 and 1957 petitioners omitted from gross income amounts which were in excess of 25 percent of the amounts of gross income stated in their returns. Therefore, the statute of limitations does not bar the assessment and collection of the deficiencies in income taxes and the additions to tax for such years. 4. Petitioners failed to file declarations of estimated tax for the years 1952, 1953 and 1954 and such failure has not been shown to have been due to reasonable cause and not to willful neglect. Opinion The deficiencies here involved were calculated by using the net worth plus expenditures method of computing taxable income. Petitioner does not object to the use of this method. Respondent has shown a lack of records and a diligent tracing of leads to substantiate its use of the net worth method. ; (C.A. 4, 1955), affirming . However, *83 petitioner's objections on brief center on the nature of the net worth method and how it should be applied to the facts of this case. We disagee with petitioner's conception of net worth method. [1]
*84 Petitioner claims he had $20,000 cash on hand at the end of 1951. His only offer of proof in this regard is his own uncorroborated testimony. The respondent contends there was no cash on hand at all. This assumption is based upon petitioner's stipulation that he borrowed money twice during December 1951. After carefully examining the record, we conclude that $2,000 is the most accurate approximation of cash on hand. (C.A. 4, 1961), affirming a Memorandum Opinion of this Court. Petitioner's assertion that he had $20,000 on hand was seriously weakened by his inability to satisfactorily explain its accumulation. His claim that the entire amount came from the McNeil-Kelley partnership is refuted by the partnership's tax return for that year which shows that petitioner received only $15,000. Consequently, 25 percent of the suggested figure is unaccounted for even as to source. Of the $15,000 received from the partnership, it has been stipulated that $14,685 represents petitioner's share in the proceeds of sale of the Ellis Hotel, a partnership asset. This sum was placed in a bank account shortly after petitioner received it from the *85 partnership in January 1951. By the end of the year the balance in this account had been reduced to $105.35. Petitioner argues that he made the withdrawals to build up a reserve of cash on hand. But the withdrawals indicate anything but a pattern of building a cash hoard. They were made at odd times and for varying uneven amounts, thus strongly suggesting normal everyday use of a checking account. Finally, petitioner told the State of California agents investigating his returns at an early conference that he never had more than $2,000 on hand during this period. From the testimony of all the parties involved this is the most credible estimate. Therefore, we have adopted it for the opening net worth statement as well as for the succeeding years in issue. Petitioner's request that his household furnishings and personal dwelling be valued at fair market rather than cost in the opening net worth statement can be quickly settled. In making use of the net worth method of calculating annual income only the cost to the taxpayer of assets used in such calculation is material. The fluctuating market values are irrelevant and immaterial. The proper *86 concern is not what the taxpayer could get for such assets on the open market, but what was spent for them. This is especially true in opening net worth statements because sale in subsequent years at a profit will affect taxable income and corresponding net worth statements must be based on taxable income and not on unrealized and nontaxable increments in value. Petitioner suggests that three items paid for in cash, namely, his real property at 2031 Third Avenue, the 1956 Lincoln Continental, and two diamond rings, were counted twice because no reduction in cash was made in the closing balances of the respective years of purchase. This argument is without merit since it fails to meet the issue. Respondent has determined that these assets were purchased from current unreported income which was spent during the year earned. Consequently, it could not make its way into the cash inventory in the ending net worth statements. We are also asked to exclude the Nakatani note receivable for the reason that it represents payment for an asset on hand in the opening net worth statement. This note was properly included because it represented partial *87 payment for the purchase of petitioner's interest in the La Jolla Hotel, pursuant to a liquidation of the McNeil-Kelley partnership in October 1954. The respondent correctly deducted these partnership holdings from petitioner's ending net worth of December 31, 1954, showing their conversion into the Nakatani receivable. The Victoria Street residence and the two South Figueroa Street lots were also partially paid for by petitioner's share of the proceeds of the liquidated partnership and we find that these amounts are also properly shown. Petitioner additionally makes the peculiar claim that $20,000 of the purchase price of these three assets came from a cash hoard accumulated during the years 1952, 1953, and 1954. Since no other source is suggested by petitioner we assume that these alleged funds were developed from taxable income, yet the returns for the period show no income for 1952, only $248.76 for 1953, and $9,704.09 for 1954, all before nondeductible expenses. If such a $20,000 fund did exist, it must have been generated by unreported taxable income. With respect to the cash purchase items just discussed, as well as the cash on hand balance during the years in issue, petitioner *88 raises an additional objection with which we cannot agree. He argues that a cumulative error occurs whenever a so-called "doublecharge" takes place. He says that not only does the original error occur, but an additional error of like amount results in each successive year because of a failure to remove the overcharge. We have already rejected the various contentions pressed by petitioner as to the includability of these assets in the year of purchase and we likewise reject the theory of cumulative error based thereon as being an improper explanation of the net worth method. Finally, we reject petitioner's assertion that the losses on confiscation and trade-in of his personal automobiles are improper additions to the net worth computation. There is no difference between a nondeductible loss and a nondeductible expense for both represent a drain on taxable income. Consistent failure to report "substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. Respondent has the burden of proof on this issue, and on *89 facts similar to those before us here it has been held that "this burden is clearly sustained by the discrepancies between real net income and reported net income for so many years." (C.A. 6, 1956). See also (C.A. 6, 1957), and (C.A. 6, 1955). If the understatements were the only factor involved, we would feel justified in finding fraud in this case. However, additional facts support this finding. Petitioner failed to produce his books and records. He argues that he destroyed them after the statute of limitations ran because he felt it unnecessary to retain them after that time. But in July 1957 petitioner knew he was being investigated. This fact was plainly brought to his attention in an interview with the State of California revenue agents at the home of his accountant. The destruction of his records at that time with the knowledge that an investigation was taking place is evidence of an attempt to conceal the truth. In , we said that usually fraud "must be gleaned from *90 the several transactions in question and the conduct of the taxpayer relative thereto." Our impressions of the petitioner under examination, his large cash transactions, and reluctance to cooperate with respondent's revenue agents even after the criminal investigation in this case had been terminated in his favor, all operate to support our finding that the understatements found herein were due to fraud. Accordingly, we sustain respondent's additions to tax under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code. In view of this holding, petitioner's contention that the statute of limitations bars assessments of the deficiencies determined is without merit, and we find for respondent on this issue. Petitioners failed to file declarations of estimated tax for the years 1952, 1953, and 1954. Such declarations should have been filed. The additions to tax under section 294(d)(1)(A) of the 1939 Code are applicable unless petitioners' failure to file declarations of estimated tax is shown to have been due to reasonable cause and not to willful neglect. Since petitioners have not introduced any evidence to explain their failure to file the declarations of estimated *91 tax, they have failed to establish the requisite reasonable cause. Therefore, we sustain respondent on this issue. Decision will be entered under Rule 50. Footnotes
*. By official order of the Tax Court dated December 1, 1964 and signed by Judge Dawson, this table was substituted for the one contained in the original opinion.↩
1. Includes itemized deductions taken in years Standard Deduction was used in recomputation. ↩
2. Includes losses on confiscation. ↩
3. Standard Deduction used for 1952, 1953, 1954, and 1955, plus discounts received on payables in 1953 and 1955. Itemized deductions for 1956, 1957, and 1958 are reflected in reduced asset values. ↩
1. The net worth plus expenditures method is an attempt to reconstruct the income of a given period by inventorying the taxpayer's assets and liabilities. It is a truism that nothing is income or expense as such. These are merely terms used to describe the acquisition and disbursement of assets and liabilities. Profit and loss are activities, not things; they are the terms used to describe how balance sheet items (assets and liabilities) are derived. Income and expense always produce assets and liabilities. Since this is so, then one can look backward from the assets and liabilities on hand at a given date and reconstruct what income and expense would have been necessary to produce them, given a statement of assets and liabilities that existed at the beginning of the period. But stopping there would only account for the income that was on hand in the form of assets or liabilities at the closing balance sheet date. As in normal inventory situations, merely knowing the opening and closing inventories of a given item gives no indication of what sales occurred during the period: the number of purchases is also required to determine that fact. Conversely, a sales figure for a given period can be accurately determined by subtracting from the total goods available for sale (ending inventory plus purchases during the year) the opening goods on hand. Likewise, if the opening net worth (assets minus liabilities) is subtracted from the sum of ending net worth plus expenditures, the difference must necessarily be the income realized during the period. This example, of course, assumes no nontaxable sources of funds existed during the year and the facts of this case are identical with such an assumption. It is stipulated by the parties that no gifts or inheritances were received by the petitioner and no other nontaxable source from which petitioner's increases in net worth could have developed has been advanced by him anywhere in this proceeding. It should be noted that in normal inventory situations, overstatements in the ending inventory are automatically washed out in the following year. Overstating the ending inventory necessarily results in understating the amount of goods sold, thus overstating profit. But since such an overstatement in the ending inventory of one year becomes an overstatement of the opening inventory in the following year, the successive year's income is understated in an amount equal to the original error. Such would not be the case, however, in a net worth situation if the overstatement continued to appear in each ending net worth statement. The original error would not be offset but would remain. This is not to say, however, that such an error would also overstate each successive year's income. Once the overstatement enters both ending and opening inventories, it can no longer affect the income that is subsequently produced since no new error then occurs.↩